FIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

DOUGLAS HOUSTON,

                        Plaintiff,

                                        Civil Action No.
          v.                            9:11-CV-1535 (LEK/DEP)

  DR. BUGHRARA;[1] *et al.*,

                        Defendants.

_____

APPEARANCES:                    OF COUNSEL:

FOR PLAINTIFF:

HOUSTON DOUGLAS, *Pro Se*
06-A-2860
Five Points Correctional Facility
Caller Box 119
Romulus, NY 14541

FOR DEFENDANTS:

MAYNARD, O'CONNOR LAW FIRM      ROBERT A. RAUSCH, ESQ.
6 Tower Place
Albany, NY 12203

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

_____

[1]     The lead defendant in this case is sued as "Dr. Bughara." Compl. (Dkt. No. 1) at 2. It appears from documents now before the court, however, that the proper spelling of his name is "Bughrara." Bughrara Aff. (Dkt. No. 23-9). Accordingly, the clerk is respectfully requested to amend the court's records to reflect the correct spelling of his name.

REPORT AND RECOMMENDATION

Plaintiff Douglas Houston, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights. In his complaint, he alleges that the defendants, all of whom are medical personnel employed at the Albany Medical Center ("AMC"), are responsible for injuries resulting from the improper insertion of an intravenous ("IV") line while he was admitted to that hospital in the fall of 2011, causing burning on his arm.

Currently pending before the court is a motion brought by the defendants requesting the entry of summary judgment dismissing plaintiff's complaint, based both upon the controlling statue of limitations and on the merits. For the reasons set forth below, I recommend that defendants' motion be granted, and plaintiff's complaint be dismissed in its entirety.

I.    BACKGROUND[2]

Plaintiff is a New York prison inmate who has been held in the

_____

[2]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

custody of the Department of Corrections and Community Supervision ("DOCCS") since 2006. . Tr. (Dkt. No. 25-1) at 32-36. At all times relevant to his claim, plaintiff was housed in the Residential Medical Unit ("RMU") of the Coxsackie Correctional Facility ("Coxsackie"), located in Coxsackie, New York. *Id*. at 49. The events giving rise to this suit took place at AMC, where plaintiff was admitted as a patient in November 2008 for treatment of pneumonia. *Id*. at 51-53; Rausch Decl. Exh. F (Dkt. No. 25-2) at 3; Bughrara Aff. (Dkt. No. 25-9) at ¶ 3.

Plaintiff has a history of serious health problems, including type 2 diabetes and myasthenia gravis, a neurological condition. Douglas Dep. Tr. (Dkt. No. 25-1) at 41. As a result, plaintiff has been assigned to the RMU at Coxsackie for long-term treatment since 2007. *Id.* at 43-44, 49.

Early in November 2008, plaintiff experienced shortness of breath for a period of five days, accompanied by chills, a low grade fever, and a "dry" cough. Rausch Decl. Exh. F (Dkt. No. 25-2) at 3. He was ultimately sent to the AMC by the Coxsackie medical staff for further treatment, where he was diagnosed with, *inter alia*, pneumonia. *Id.*; Bughrara Aff. (Dkt. No. 25-9) at ¶ 3.

As part of plaintiff's course of treatment at the AMC, an IV line was

3

to be installed into plaintiff's neck to permit medical personnel both to administer medication and draw blood. Rausch Decl. Exh. F (Dkt. No. 25-2) at 3; Douglas Dep. Tr. (Dkt. No. 25-1) at 59. After some discussion with defendant IV Specialist Doe, an IV technician or nurse employed at the AMC, plaintiff refused to have the IV installed in his neck or his leg[3]. Douglas Dep. Tr. (Dkt. No 25-1) at 59; Rausch Decl. Exh. F (Dkt. No. 25-3) at 21. Consequently, defendant IV Specialist Doe installed the line in plaintiff's right forearm instead. *Id*.

Within a few hours of that insertion, plaintiff noticed his arm beginning to swell near where the IV line entered. Douglas Dep. Tr. (Dkt. No 25-1) at 59; Rausch Decl. Exh. F (Dkt. No. 25-3) at 21-22. Shortly thereafter, the IV was removed from plaintiff's forearm. Douglas Dep. Tr. (Dkt. No 25-1) at 72-73. Plaintiff's hospital records note that, at first, only the area of plaintiff's skin contacting the IV tape had developed blisters. Rausch Decl. Exh. F (Dkt. No. 25-2) at 22. Over the course of the next few days, plaintiff's blisters were treated with dressings and antibiotic

---

[3]     As will be discussed more completely below in Part III.B. of this report, the fact that defendant IV Specialist Doe's identity is still unknown at this late stage in the proceedings is not dispositive. Even viewing the case in the utmost favorable light to plaintiff, the record evidence does not support a finding that any of the AMC medical staff members who treated plaintiff during the relevant time period violated his Eighth Amendment rights, even assuming their amenability to suit under section 1983.

ointment. *Id*. at 5; Douglas Dep. Tr. (Dkt. No. 25-1) at 76-77; Rausch Decl. Exh. F (Dkt. No. 25-3) at 36, 38, 46, 52.

By November 11, 2008, the blisters on plaintiff's right forearm had spread. Rausch Decl. Exh. F (Dkt. No. 25-3) at 48. Some of the blisters had broken open and were not healing quickly. *Id*. According to hospital records, defendants Bughrara and Byrd, both of whom are physicians employed at the AMC, were notified regarding the situation, and the blisters in particular. *Id.* at 46. In addition, Dr. Chao, a plastic surgeon working at the hospital, examined plaintiff, and concluded that his wounds were not infected, they amounted to nothing more than ordinary blisters, and they would heal over time with dressing changes. *Id*. at 48.

Plaintiff's complaint alleges that, as a result of defendants' conduct, the injury to his right forearm caused him pain for several months. Compl. (Dkt. No. 1) at 6-7; Douglas Dep. Tr. (Dkt. No. 25-1) at 82. During his deposition, Houston testified that he continues to feel stiffness in his right arm when he makes a fist, a condition that he attributes to his injury from the IV. Douglas Dep. Tr. (Dkt. No. 25-1) at 82. In contrast to these assertions, a review of plaintiff's medical records surrounding his stay at the AMC reveals that plaintiff routinely reported to medical personnel that

he was not in pain, even while his right arm was blistered. Rausch Decl. Exh. F (Dkt. No. 25-3) at 28, 33, 38, 46-47. Moreover, plaintiff's medical records from Coxsackie reflect that, following the AMC hospitalization, he reported that his right arm felt fully healed within a few weeks of his discharge. Plf.'s Resp. Exh. A (Dkt. No. 32-4) at 19, 21, 38.

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action on October 20, 2011, by filing a complaint and accompanying *in forma pauperis* application[4]. Dkt. Nos. 1, 2. Plaintiff's complaint names, as defendants, Drs. Bughrara and Byrd, and a third person identified only as "IV Specialist Doe." Compl. (Dkt. No. 1) at 2. The complaint asserts an Eighth Amendment deliberate medical indifference claim against all three defendants. *Id*. at 5-6. Plaintiff alleges that defendant IV Specialist Doe improperly inserted the IV into his arm, and that the other two defendants are accountable based upon their failure to protect him from defendant IV Specialist Doe and ensure that a qualified employee was assigned to conduct the procedure. *Id*. at 6.

Following the completion of discovery, defendants have now moved

---

[4]    Although plaintiff's complaint was filed in the Western District of New York on November 28, 2011, and subsequently transferred to this district on December 29, 2011, the court considers it filed on October 20, 2011, the date it was signed by plaintiff. *See* Part III.A.1., *post*.

for summary judgment dismissing plaintiff's complaint, arguing that (1) plaintiff's claims are barred by the applicable statute of limitations; (2) no reasonable factfinder could conclude that any of defendants acted with deliberate indifference to plaintiff's medical needs; and (3) to the extent that the court construes plaintiff's complaint as asserting a state law medical malpractice claim against the three defendants, the record is devoid of evidence from which a reasonable factfinder could conclude they were negligent. Defs.' Memo. of Law (Dkt. No. 25-7) at 2. Plaintiff has responded in opposition, arguing that the evidence upon which defendants rely does not establish the absence of any genuine material fact. *See generally* Plf.'s Resp. (Dkt. No. 32-2).

Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Statute of Limitations

In his complaint, plaintiff asserts an Eighth Amendment deliberate medical indifference claim against all defendants pursuant to section

1983. *See generally* Compl. (Dkt. No. 1). In addition, the complaint alleges sufficient facts that, liberally construed, could be regarded as giving rise to a medical malpractice claim under New York State law[5]. Compl. (Dkt. No. 1) at 6. In their motion, defendants argue that both the section 1983 and medical malpractice claims are barred by the governing statutes of limitations. Defs.' Memo. of Law (Dkt. No. 25-7) at 5-6.

1.    Plaintiff's Section 1983 Claim

The applicable limitation period for a section 1983 action is derived from the general or residual statute of limitations for personal injury actions under the laws of the forum state. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989). Accordingly, in New York, the statute of limitations for a section 1983 action is three years. N.Y. C.P.L.R. § 214(5); *see also Connolly v. McCall*, 254 F.3d 36, 40-41 (2d Cir. 2001) ("[The plaintiff's] federal constitutional claims, brought pursuant to 42 U.S.C. § 1983, are governed by New York's three-year statute of limitations for personal injury actions[.]"); *accord*, *Pinaud v. Cnty. of Suffolk*, 52 F.3d 1138, 1156 (2d Cir. 1995). A claim arising under section 1983 accrues "when the

---

[5]    Defendants have also construed plaintiff's complaint as asserting a medical malpractice cause of action, and have expressly moved for summary judgment on that claim. Defs.' Memo. of Law (Dkt. No. 25-7) at 2.

plaintiff knows or has reason to know of the harm that he seeks to redress." *Connolly*, 254 F.3d at 41 (quotation marks omitted).

In certain circumstances, the continuing violation doctrine has been applied to toll the governing statute of limitations in the context of section 1983 claims. *See Shomo v. City of N.Y.*, 579 F.3d 176, 182 (2d Cir. 2009) (finding the continuing violation doctrine can apply "when a prisoner challenges a series of acts that together comprise an Eighth Amendment claim of deliberate indifference to serious medical needs"); *see also Matthews v. Conn. Dep't of Pub. Safety*, No. 10-CV-0325, 2010 WL 39847645, at *6 (D. Conn. Oct. 8, 2010) (applying the doctrine to a section 1983 First Amendment retaliation claim)[6]. "To assert a continuing violation for statute of limitations purposes [in actions where the plaintiff has asserted an Eighth Amendment deliberate medical indifference claim], the plaintiff must allege both the existence of an ongoing policy of deliberate indifference to his . . . serious medical needs and some non-time-barred acts taken in furtherance of that policy." *Shomo*, 579 F.3d at 182 (quotation marks and original alterations omitted).

---

[6]     Copies of all unreported decisions have been appended to this report for the convenience of the *pro se* plaintiff.

In this case, the conduct of which plaintiff now complains occurred on November 7, 2008. Compl. (Dkt. No. 1); Douglas Dep. (Dkt. No. 25-1) at 53. Plaintiff has testified that he knew he had been harmed later that day. Douglas Dep. (Dkt. No. 25-1) at 70-71. Without consideration of the continuing violation doctrine, which does not apply in this case, plaintiff must have filed this action no later than November 7, 2011 for it to be timely. Although plaintiff's complaint was not filed with the court until November 28, 2011, it is dated October 20, 2011. Compl. (Dkt. No. 1) at 2, 8. Under the prison mailbox rule, recognized in this circuit as controlling for purposes of a statute of limitations analysis in a prisoner civil rights action, a *pro se* inmate's papers are deemed filed as of the date appearing on the complaint. *Tracy v. Freshwater*, No. 01-CV-0500, 2008 WL 850594, at *1 (N.D.N.Y. Mar. 28, 2008) (McCurn, J.). Accordingly, plaintiff's section 1983 claim in this case is timely.

## 2.  Plaintiff's Medical Malpractice Claim

In New York, "[a]n action for medical . . . malpractice must be commenced within two years and six months of the act, omission or failure complained of or last treatment where there is continuous treatment for the same illness, injury, or condition which gave rise to the said act,

omission or failure[.]" N.Y. C.P.L.R. § 214-a. In this case, plaintiff's medical records reveal that he continued to receive treatment from medical staff at Coxsackie for the blisters after being discharged from AMC up until November 25, 2008. Plf.'s Exh. A (Dkt. No. 32-4) at 23. Under New York law, plaintiff was required to have commenced this action asserting medical malpractice no later than two-and-a-half years after the last date plaintiff was treated for the blisters, or by May 25, 2011. N.Y. C.P.L.R. §214-a. As was discussed above, I have considered this action to have been commenced on October 20, 2011, five months after the expiration of the statute of limitations governing the medical malpractice claim. Accordingly, because that claim was not timely filed, I recommend dismissal of any malpractice cause of action discerned from plaintiff's complaint on the basis of the governing statute of limitations.

B.    Identity of Defendant IV Specialist Doe

The court previously directed plaintiff to take reasonable steps to ascertain the name of unnamed defendant IV Specialist Doe. Decision and Order (Dkt. No. 6) at 3. To assist the plaintiff, the court ordered defendants to disclose to plaintiff the names of the two male members of the AMC IV service working at the time in question by October 3, 2012.

Order (Dkt. No. 23) at 4, ¶ 5. Plaintiff was advised that, in the event he was unable to identify defendant IV Specialist Doe, his claims against that defendant would be dismissed. *Id.* Discovery is now complete, and plaintiff has failed to identify that defendant. Douglas Aff. (Dkt. No. 32-1) at ¶ 7.

While courts in this circuit are hesitant to dismiss a claim for failure to prosecute, *see*, *e.g.*, *Lucas v. Miles*, 84 F.3d 532, 535 (2d Cir. 1996) (citing four Second Circuit cases that recognize a Rule 41(b) dismissal for failure to prosecute is a "harsh remedy [that] is appropriate only in extreme circumstances"), I need not decide whether to recommend dismissal of plaintiff's claims against defendant IV Specialist Doe due to plaintiff's failure to identify him because, as will be discussed more completely below, even after reviewing all of the record evidence, and drawing all inferences in favor of plaintiff, I conclude that no reasonable factfinder could conclude that any of the AMC medical staff treating plaintiff during the relevant time period violated plaintiff's Eighth Amendment rights. *See* Part III.D., *post*.

C.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary

judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

D.  Plaintiff's Eighth Amendment Medical Deliberate Indifference Claim

Plaintiff's complaint asserts a medical indifference claim under the Eighth Amendment against defendant IV Specialist Doe arising from allegations that, while he was receiving treatment at the AMC in November of 2008, defendant IV Specialist Doe improperly installed an IV into his arm, resulting in burns that caused blisters to form*. See generally* Compl. (Dkt. No.1). Plaintiff also alleges that defendants Bughrara and Byrd violated his Eighth Amendment rights because they supervised defendant IV Specialist Doe in inserting the IV. *Id.* at 6. In support of their

motion for summary judgment, defendants argue that plaintiff suffered only "temporary swelling and blistering from which he fully recovered," a condition that is not sufficiently serious to support an Eighth Amendment claim. Defs.' Memo. of Law (Dkt. No. 25-7) at 6. In addition, defendants argue that they did not act with the requisite mental state for a claim of deliberate indifference to a serious medical condition under the Eighth Amendment. *Id.*

### 1.   Legal Standard Governing Deliberate Indifference

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or which 'involve the unnecessary and wanton infliction of pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (internal citations omitted)). While the Eighth Amendment "'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to

provide inmates with medical care, "[i]n the worst cases, . . . may actually produce physical torture or lingering death, [and] . . . [i]n less serious cases, . . . may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging a violation of the Eighth Amendment's protection against cruel and unusual punishment through deliberate indifference to a serious medical condition must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care . . . . Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (internal citations omitted).

The second element of the objective test requires a court to examine the seriousness of the inmate's medical condition, in the event the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (internal quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations marks omitted).

To satisfy the subjective requirement of the deliberate indifference analysis, a plaintiff must demonstrate that the defendant had acted with "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40).

      2.   <u>Analysis</u>

As to the objective element of plaintiff's deliberate medical indifference claim, there is no record evidence to support a finding, and

plaintiff does not allege, that he was denied medical care altogether[7].

Instead, plaintiff alleges only that defendants' medical treatment, and

specifically the insertion of an IV, amounted to inadequate care rising to

the level of a constitutional violation. Compl. (Dkt. No. 1) at 6. Accordingly,

the court's inquiry is narrowed to the question of whether defendants'

conduct was "inadequate and what harm, if any, the inadequacy has

caused or will likely cause the prisoner[8]." *Salahuddin*, 467 F.3d at 280.

　　It is undisputed that plaintiff's arm developed blisters after an IV was

installed into his right forearm. Douglas Dep. Tr. (Dkt. No 25-1) at 59;

Rausch Decl. Exh. F (Dkt. No. 25-3) at 21-22. Plaintiff complains that his

skin has retained some scars and that he experienced some pain for as

long as six months after he left the AMC. Douglas Dep. Tr. (Dkt. No. 25-1)

at 82-84. In contrast, however, plaintiff also testified at his deposition that

the pain subsided, and that he continues to have full use of his right arm.

---

[7]　　Indeed, it is uncontested that plaintiff was admitted to the AMC for six days surrounding this incident for treatment of pneumonia. Rausch Decl. Ex. F (Dkt. No. 25-2) at 2, 3, 68-73. Additionally, the parties do not dispute that plaintiff received treatment for the blisters on his arm in the form of antibiotic ointments and dressings throughout the remainder of his stay at the hospital. Douglas Dep. Tr. (Dkt. No. 25-1) at 76-77; Rausch Decl. Exh. F (Dkt. No. 25-3) at 36, 38, 46, 52.

[8]　　In light of the fact that plaintiff has not identified defendant IV Specialist Doe, out of special solicitude to the *pro se* plaintiff, my review of the entire record has focused on whether any of the care provided to plaintiff during the relevant time by AMC medical staff could support an Eighth Amendment violation.

*Id.* at 94-95. Additionally, a review of plaintiff's medical records surrounding his stay at the AMC reveal that plaintiff routinely reported that he was not in pain when his arm was blistered, and upon returning to Coxsackie from the hospital, plaintiff informed prison medical staff that his right arm felt fully healed within a few weeks of his release. Rausch Decl. Exh. F (Dkt. No. 25-3) at 28, 33, 38, 46-47; Plf.'s Resp. Exh. A (Dkt. No. 32-4) at 19, 21, 38. Moreover, while plaintiff was still a patient at the AMC, Dr. Chao concluded that plaintiff's wounds were not infected, they amounted to nothing more than ordinary blisters, and would heal over time on their own with dressing changes. Rausch Decl. Exh. F (Dkt. No. 25-3) at 48.

Even drawing every reasonable inference in plaintiff's favor, I find that no reasonable factfinder could conclude that, objectively, defendants' conduct resulted in harm to plaintiff which violated his constitutional rights. *See Gantt v. Horn,* No. 09-CV-7310, 2013 WL 865844, at *9 (S.D.N.Y. Mar. 8, 2013) (finding that inadequate medical care only satisfies the objective element of an Eighth Amendment deliberate medical indifference claim where it "cause[s] extreme pain or exacerbate[s] a serious illness"); *Vasquez v. Canfield*, 678 F. Supp. 2d 96, 99 (W.D.N.Y. 2010) (granting

summary judgment for defendant where plaintiff alleged that mis-diagnosis of an injury caused him unnecessary pain and complications).

Similarly, as it relates to the subjective element, there is no record evidence from which a reasonable factfinder could conclude that defendants were deliberately indifferent to plaintiff's medical needs. The only facts in the record that even remotely suggest the mental state of defendant IV Specialist Doe at the time he installed the IV is plaintiff's own testimony, in which he describes a conversation he had with that defendant. Douglas Dep. Tr. (Dkt. No. 25-2) at 67-69. During that exchange, defendant IV Specialist Doe described the potential risks of the IV to plaintiff, and then installed it into plaintiff's forearm after Houston refused to have it placed in his neck or leg. *Id*. Nowhere in the record has plaintiff suggested that defendant IV Specialist Doe, or either of the other two defendants, knew that installing an IV line in plaintiff's arm would cause him harm but proceeded to do it anyway, with a knowing disregard for plaintiff's health or safety.

Additionally, although plaintiff alleges that defendants Bughrara and Byrd were negligent in supervising defendant IV technician Doe in installing an IV, Compl. (Dkt. No. 1) at 6, it is well-established that an

allegation of negligence alone is insufficient to support a section 1983 claim. *See Farmer*, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."); *Estelle*, 429 U.S. at 106 ("Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *see also Smith,* 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").

In light of my careful review of the record now before me, I find that it lacks any evidence from which a reasonable jury could conclude that any of the named defendants violated plaintiff's constitutional rights. Accordingly, I recommend that plaintiff's deliberate medical indifference claim be dismissed as against all defendants.

IV.    SUMMARY AND RECOMMENDATION

The record now before the court contains no evidence from which a reasonable jury could conclude that plaintiff's constitutional rights have been violated. Addressing first the objective element of plaintiff's Eighth Amendment deliberate medical indifference claim, the evidence fails to

demonstrate that the allegedly improper insertion of an IV into plaintiff's right forearm was sufficiently serious to support a constitutional claim. Turning to the subjective element, the record evidence is completely devoid of any indication that the defendants acted with the requisite deliberate indifference to plaintiff's health or safety. In addition, to the extent plaintiff's complaint can be construed to assert a medical malpractice claim, that cause of action is barred by the governing statute of limitations under New York State law.

It is therefore respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 25) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety as against all three defendants.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the plaintiff by mailing it to the address listed on the court's docket sheet.

Dated:      August 1, 2013
              Syracuse, New York

_____
David E. Peebles
U.S. Magistrate Judge

Not Reported in F.Supp.2d, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))



Only the Westlaw citation is currently available.
United States District Court,

D. Connecticut.
Andrew N. MATTHEWS, Plaintiff,
v.
STATE OF CONNECTICUT, Department of Public
Safety, Leonard C. Boyle, Defendants.
No. 3:10cv325 (MRK).

Oct. 8, 2010.

Jacques J. Parenteau, Katalin A. Demitrus, Madsen, Prestley & Parenteau, LLC–NL, New London, CT, Kera L. Paoff, Madsen, Prestley & Parenteau, LLC, Hartford, CT, for Plaintiff.

John P. Shea, Jr., Zachary David Schurin, Sullivan, Schoen, Campane & Connon, LLC, Hartford, CT, for Defendants.

### RULING AND ORDER

MARK R. KRAVITZ, District Judge.

**\*1** In this case, Connecticut State Police Sergeant Andrew N. Matthews alleges that his employer unlawfully retaliated against him for speaking out against a variety of misconduct by his fellow officers and against his employer's attempts to cover up that misconduct. Defendants are the State of Connecticut; Mr. Matthews' employer, the Department of Public Safety; and Leonard C. Boyle, the Department's former Commissioner. Pending before the Court is Defendants' Renewed Motion to Dismiss [doc. # 33] for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendants' Motion to Dismiss [doc. # 33] is GRANTED.

**I.**

As it must, the Court accepts the factual allegations in Mr. Matthews' Second Amended Complaint [doc. # 29] as true, and draws all reasonable inferences in Mr. Matthews' favor. See Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir.2009). Mr. Matthews joined the Department of Public Safety in January 1998. In July 2004, he was promoted to Sergeant and transferred to the Internal Affairs Division. While Mr. Matthews was a member of the Internal Affairs Division, he learned that Department management had a practice of covering up a variety of misconduct by state police officers, including alcohol abuse, drunk driving, sexual abuse, and domestic violence. Mr. Matthews complained about the misconduct and the cover-ups to others in the Department.

Mr. Matthews first complained to the Connecticut Attorney General's Office about the misconduct and cover-ups in June 2005. Mr. Boyle, who was at that time the Department's Commissioner, knew that Mr. Matthews contacted the Attorney General's Office. On June 16, 2005, Mr. Boyle authorized a meeting to request that Mr. Matthews allow the Department to handle his complaint internally. Mr. Matthews refused and sent a letter to Mr. Boyle informing him that he intended to file a formal retaliation complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO").

On July 7, 2005, Mr. Boyle authorized Mr. Matthews' transfer from the Internal Affairs Division to the newly-created Risk Management Unit. Although the Risk Management Unit was located in the Department's Professional Standards building in Meriden, Mr. Boyle assigned Mr. Matthews to remain in a cubicle at the Department's Middletown Headquarters. Mr. Boyle later changed the Department's table of organization to make it appear that Mr. Matthews' transfer to the Risk Management Unit was non-disciplinary.

Mr. Matthews contacted the Attorney General's Office for a second time in August 2005, and on August 22, 2005, he filed a grievance with his union about his transfer to the Risk Management Unit. On September 7, 2005, Mr. Boyle authorized the Department to issue a negative Personnel Evaluation Report regarding Mr. Matthews' performance as a member of the Internal Affairs Division. Mr. Matthews received the lowest performance rating of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

all the members of the Internal Affairs Division, which was not consistent with his other performance ratings. For example, on September 8, 2005, Mr. Matthews received a "Superior" rating for his performance as a member of the Risk Management Unit.

**\*2** On September 21, 2005, an officer acting under Mr. Boyle's authority held a meeting with Mr. Matthews. The officer told Mr. Matthews that he "would do anything to prevent something from smearing the image of the agency." On September 23, 2005, Mr. Boyle's Chief of Staff held a meeting with Mr. Matthews to discuss his complaints about the Department. When Mr. Matthews returned to his desk, he found a handwritten note on his desk that read: "CANCER." Mr. Matthews reported the incident to his superiors, and Mr. Boyle opened an Internal Affairs investigation. However, the Internal Affairs Division lost the note and never completed the investigation. Mr. Matthews requested that Mr. Boyle open a criminal investigation, but Mr. Boyle failed to do so. Mr. Matthews began to fear for his physical safety and voluntarily elected to work out of the Department's Meriden building—where the other members of the Risk Management Unit were located—rather than out of the Middletown Headquarters.

Beginning in October 2005, the Department called in the New York State Police to conduct an independent investigation of the Internal Affairs Division. The New York State Police investigation lasted for approximately one year. In mid-October 2005, after the New York State Police investigation was under way, Mr. Matthews again contacted the Attorney General's Office to complain about the "CANCER" note and the Department's failure to sufficiently investigate the note.

In March 2006, an Internal Affairs officer designated Mr. Matthews as the target of an Internal Affairs investigation. Mr. Boyle assigned the officer who filed the complaint against Mr. Matthews to investigate the allegations against him. When Mr. Matthews requested that the Department provide him with a copy of the complaint against him before his interview with the investigator, Mr. Boyle refused to do so.

As a member of the Risk Management, it was Mr.

Matthews' duty to review other officers' use of force reports. In April 2006, Mr. Matthews made a complaint within the Department about another officer's improper use of force report and about the Department's failure to investigate that report. Mr. Matthews held a meeting with a superior officer regarding his complaint on April 26, 2006. At the meeting, the officer informed Mr. Matthews that Mr. Boyle had decided to move the Risk Management Unit from the Meriden building back to the Middletown Headquarters. The officer also informed Mr. Matthews that Mr. Boyle had decided that the Risk Management Unit would no longer be responsible for reviewing use of force reports.

On May 24, 2006, Mr. Matthews wrote a letter to Mr. Boyle complaining that he did not want to return to the Middletown Headquarters because he considered it a hostile work environment. On May 26, 2006, Mr. Matthews filed a grievance with his union regarding the transfer. Nevertheless, Mr. Matthews returned to the Middletown Headquarters as ordered on June 6, 2006. In May or June 2006, around the time of Mr. Matthews' return, Mr. Boyle permanently locked the door to the "Commissioner's Suite." The Suite housed Mr. Boyle's office as well as mailboxes for other officers, including Mr. Matthews. The Suite had previously been routinely left open for all officers to access. After May or June 2006, it was only accessible via keycard, and Mr. Matthews was not provided with a keycard to access the Suite.

**\*3** On June 15, 2006, Mr. Matthews filed a retaliation complaint with the CHRO. On June 22, 2006, he wrote the Attorney General's Office requesting protection from the Department's management, including Mr. Boyle. He also filed a retaliation complaint with the Attorney General's Office. During the Attorney General's investigation of the complaint, Mr. Boyle requested that the Department's internal legal advisor be permitted to sit in on witness interviews. The Attorney General's Office granted Mr. Boyle's request.

On November 21, 2006, Mr. Matthews' union wrote to Mr. Boyle requesting that Mr. Matthews be reassigned to a different work location outside the Middletown Headquarters. Mr. Boyle approved the request. However,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

Mr. Boyle did not immediately provide Mr. Matthews with an alternative workspace. Starting in November 2006, rather than work from the Middletown Headquarters, Mr. Boyle began working out of his police cruiser.

On December 4, 2006, the New York State Police issued a report based on its investigation of the Internal Affairs Division. The report concluded that the Internal Affairs Division had a pattern and practice of tolerating unethical and unlawful acts by Department officers and managers. On December 7, 2006, Mr. Matthews again wrote to the Attorney General's Office requesting protection from further retaliation. On January 12, 2007, Mr. Matthews' union wrote to Mr. Boyle to request that in light of the report, Mr. Matthews should not be transferred back to the Middletown Headquarters.

In February 2007, Mr. Matthews' union wrote to Mr. Boyle requesting that Mr. Matthews be placed on paid leave pending the completion of the Attorney General's investigation. On February 7, 2007, Mr. Boyle denied the request for paid leave. However, Mr. Boyle approved a transfer of Mr. Matthews out of the Middletown Headquarters and into Department office space in Hartford. The Hartford office space was being used at the time to conduct criminal interviews stemming from the New York State Police investigation into the Internal Affairs Division.

On February 20, 2007, Mr. Matthews' union wrote to Mr. Boyle requesting that Mr. Matthews be assigned to office space at the Department's Meriden building until the criminal interviews at the Hartford office space were completed. On February 26, 2007, Mr. Boyle approved that request. Mr. Matthews was assigned to work from a mailroom that also housed a soda machine. Mr. Matthews was not allowed to use any of the common areas in the building, including the lunch room. On February 28, 2007, Mr. Boyle met with a superior officer and complained that the mailroom was not a sufficiently secure location for his work. Sometime in early 2007, Mr. Boyle referred Mr. Matthews to the Department's Employee Assistance Program for psychological counseling. Mr. Boyle left the Department on March 1, 2007 to begin federal government service.

Mr. Matthews filed his Complaint [doc. # 1] against the State of Connecticut, the Connecticut Department of Public Safety, and Mr. Boyle in the Connecticut Superior Court on February 4, 2010.[FN1] The complaint asserted a claim against the State of Connecticut and the Connecticut Department of Public Safety under Connecticut General Statutes § 31–59q. It also asserted a First Amendment retaliation claim against Mr. Boyle under 42 U.S.C. § 1983. Defendants filed a Notice of Removal [doc. # 1] in this Court on March 4, 2010. Defendants were able to remove the case to federal court because of Mr. Matthews' federal law claim against Mr. Boyle.

> FN1. Mr. Matthews filed a complaint against other defendants premised on essentially the same set of facts nearly three years earlier. *See Matthews v. Blumenthal,* No. 3:07cv739 (WWE) (D. Conn. filed May 9, 2007).

**\*4** Defendants filed their first Motion to Dismiss [doc. # 15] for failure to state a claim pursuant to Rule 12(b)(6) on May 13, 2010. The Court denied that motion without prejudice to renewal because Mr. Matthews requested leave to file an amended complaint. *See* Order [doc. # 22] dated May 25, 2010. Mr. Matthews filed his Amended Complaint [doc. # 25] on June 21, 2010. The Amended Complaint asserted the same claims as the original Complaint, but included a number of additional factual allegations. On July 8, 2010, the parties filed a Consent Motion [doc. # 27] to permit Mr. Matthews to amend his complaint a second time to make minor corrections to some of those additional factual allegations. The Court granted the motion, *see* Order [doc. # 28] dated July 8, 2010, and Mr. Matthews filed his Second Amended Complaint [doc. # 29] the same day.

Defendants filed their renewed Motion to Dismiss [doc. # 33] on July 14, 2010. In support of the motion, Defendants argue in support of their motion that the Eleventh Amendment bars Mr. Matthews' § 1983 claim insofar as it seeks damages against Mr. Boyle in his official capacity, and that the Second Amended Complaint fails to state a First Amendment retaliation claim against Mr. Boyle. Mr. Matthews filed an Opposition to the Motion to Dismiss [doc. # 34] on August 4, 2010.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

Defendants filed a Reply to Mr. Matthews' Opposition [doc. # 40] on August 30, 2010.

## II.

The standard of review this Court must apply on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is a familiar one. In reviewing a complaint for failure to state a claim, the Court must "accept [ ] all factual allegations in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Holmes, 568 F.3d at 335.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)*). The "plausible grounds" requirement "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's claim for relief. *Twombly, 550 U.S. at 556; see also Arista Records, LLC v. Doe 3, 604 F.3d 110, 120–21 (2d Cir.2010)* ("[W]e reject [the] contention that *Twombly* and *Iqbal* require the pleading of specific evidence or extra facts beyond what is needed to make the claim plausible.").

## III.

The only federal law claim in Mr. Matthews' Second Amended Complaint is his First Amendment retaliation claim against Mr. Boyle under § 1983. In opposition to the pending motion, Mr. Matthews concedes that he does not seek damages against Mr. Matthews in his official capacity. Nevertheless, the Court notes that the Eleventh Amendment prohibits Mr. Matthews from seeking damages from Mr. Boyle in his official capacity.

**\*5** The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Absent waiver by a State or valid abrogation by Congress, the Eleventh Amendment bars any damage action against a State in federal court. *See Kentucky v. Graham, 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).* It also bars suits against

state officials when they are sued for damages in their individual capacities. *See id.* Section 1983 does not abrogate Eleventh Amendment immunity. *See Quern v. Jordan, 440 U.S. 332, 342, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).* The Court is therefore precluded from awarding Mr. Matthews any damages against Mr. Boyle in his official capacity.

## IV.

In support of their motion to dismiss, Defendants argue that the statute of limitations bars Mr. Matthews' First Amendment retaliation claim against Mr. Boyle under § 1983 insofar as it seeks damages based on Mr. Boyle's conduct before February 4, 2007. In Connecticut, the statute of limitations applicable to claims under § 1983 is Connecticut's three-year statute of repose for tort claims. *See* Conn. Gen.Stat. § 52–577; *Walter v. Jastremski, 430 F.3d 560, 562 (2d Cir.2005)* (applying § 52–577 to a § 1983 claim); *Ormiston v. Nelson, 117 F.3d 69, 71 (2d Cir.1997)* (holding that § 1983 claims are governed by the state statute of limitations for personal-injury actions); *Ruston v. World Wrestling Entm't, No. 3:07cv1650 (MRK), 2008 WL 824217, at \*2 (D.Conn. Mar. 25, 2008)* (applying the three year statute of limitations to a § 1983 claim). Both parties agree that § 52–577 is the applicable statute of limitations in this case.

Under § 52–577 of the Connecticut General Statutes, the relevant dates are the date of the defendant's alleged wrongful conduct and the date on which the plaintiff's action was originally filed. *See Rosenfield v. Rogin, Nassau, Caplan, Lassman & Hirtle, LLC, 69 Conn.App. 151, 159, 795 A.2d 572 (2002).* Mr. Matthews filed his original Complaint in the Superior Court on February 4, 2010. Thus, unless an exception to the ordinary statute of limitations applies here, the Court agrees with Defendants that Mr. Matthews' § 1983 claim is time-barred with respect to any actions before February 4, 2007.

Mr. Matthews argues in opposition to the pending motion that Mr. Boyle's actions as alleged in the Second Amended Complaint constituted a continuing violation of federal law. *See Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 713 (2d Cir.1996).* The continuing violation doctrine—which was originally developed in the context of Title VII claims—is an "exception to the normal know-or-should-have known accrual date" if there is

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

"evidence of an ongoing ... policy or practice." *Id.* The continuing violation doctrine applies to ongoing circumstances that combine to form a single violation that "cannot be said to occur on any particular day." *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114–15, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *cf. OBG Technical Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp.,* 503 F.Supp.2d 490, 510–11 (D.Conn.2007) (discussing the analogous continuing course of conduct doctrine). Discrete incidents that are not part of an ongoing policy or practice are not continuing violations. *See Washington v. Cnty. of Rockland,* 373 F.3d 310, 317 (2d Cir.2004).

**\*6** If the continuing violation doctrine applies to Mr. Matthews' First Amendment retaliation claim under § 1983, that claim is not time-barred with respect to *any* of his factual allegations so long as he can allege one act in furtherance of the continuing violation that occurred within the three-year limitations period. *See Harris v. City of New York,* 186 F.3d 243, 248 (2d Cir.1999). Neither the Supreme Court nor the Second Circuit has had occasion to consider whether the continuing violation doctrine can be applied to a First Amendment relation claim brought under § 1983. However, the Second Circuit recently held that the continuing violation doctrine can apply to an Eighth Amendment deliberate indifference claim brought under § 1983. *See Shomo v. City of New York,* 579 F.3d 176, 181–82 (2d Cir.2009). The Court sees no reason why the continuing violation doctrine would apply to an Eighth Amendment deliberate indifference claim under § 1983, but not to other constitutional claims under § 1983, including First Amendment retaliation claims.

Assuming, however, that the continuing violation doctrine can be applied to First Amendment retaliation claims under § 1983, the Court concludes that Mr. Matthews has not alleged a continuing First Amendment violation here. Instead, Mr. Matthews has alleged numerous *discrete* First Amendment violations by Mr. Boyle. *See Washington,* 373 F.3d at 318. In a First Amendment retaliation claim, the federal law violation is an adverse employment action causally related to the employment's exercise of his right to free speech. *See Morris v. Lindau,* 196 F.3d 102, 110–11 (2d Cir.1999). In the First Amendment retaliation context, an adverse

employment action is any action that might well dissuade a reasonable worker from exercising his right to free speech. *See Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 227 (2d Cir.2006). According to the Second Amended Complaint, before February 4, 2007, Mr. Boyle:(1) forcibly transferred Mr. Matthews from the Internal Affairs Division to the Risk Management Unit, a different unit with significantly different work responsibilities; (2) issued an untruthful negative report about Mr. Matthews' performance as a member of the Internal Affairs Division; (3) failed to investigate a threatening note to Mr. Matthews apparently sent by another officer in the Department; (4) initiated an Internal Affairs investigation of Mr. Matthews; (5) forced Mr. Matthews to return to the Middletown Headquarters even though he had left it based on fears for his safety; (6) excluded Mr. Matthews from a common space at the Middletown headquarters used by other officers; and (7) ordered Mr. Matthews transferred out of the Middletown headquarters without providing him with any alternative workspace. Any one of those seven allegations could have formed the basis for a timely retaliation claim under § 1983 against Mr. Boyle, but Mr. Matthews sat on his rights.

Mr. Matthews failure to file a timely retaliation claim under § 1983 based on any one of those alleged discrete retaliatory actions is particularly surprising in light of the fact that Mr. Matthews first threatened to file retaliation claims against Mr. Boyle and others as early as June 2005, and that he actually filed retaliation claims with both the CHRO and the Attorney General's Office in June 2006. Mr. Matthews' inaction is even more surprising in light of the fact that he filed timely § 1983 claims in federal court against a number of *other* individuals based on essentially the same set of facts in 2007, nearly three years before he filed this action. *See Matthews v. Blumenthal,* No. 3:07cv739 (WWE) (D. Conn. filed May 9, 2007).

**\*7** The Court is not at all persuaded by Mr. Matthews' repeated invocation of the phrase "pattern and practice" in opposition to the pending motion. *See, e.g.,* Pl.'s Opp. to Mot. to Dismiss [doc. # 34] at 17. The Second Circuit rejected the precise argument that Mr. Matthews makes here in *Washington v. County of Rockland,* where it held that a "series of separate acts [cannot] be characterized as an ongoing policy ... sufficient to toll the applicable statute

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

of limitation." 373 F.3d at 318. The Court therefore concludes that Mr. Boyle is time-barred from seeking damages from Mr. Boyle based on any acts that occurred before February 4, 2007.

**V.**

Mr. Matthews' Second Amended Complaint alleges only four acts by Mr. Boyle after February 4, 2007. After February 4, 2007, Mr. Boyle: (1) denied Mr. Matthews' union's request to place him on paid leave; (2) approved a request to transfer Mr. Matthews out of the Middletown Headquarters; (3) approved a request to transfer Mr. Matthews to the Department's Meriden building; and (4) referred Mr. Matthews to the Department's Employee Assistance Program for psychological counseling.[FN2] Although Mr. Matthews' Second Amended Complaint refers to a number of other events that occurred after February 4, 2007—namely, that Mr. Matthews was required to work out of an unsecured mailroom and excluded from common areas at the Meriden building—Mr. Matthews nowhere alleges that Mr. Boyle had personal knowledge of those events or was in any fashion personally responsible for those events. *See Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003) (recognizing that supervisor liability in a § 1983 action depends on a showing of personal responsibility). The Court concludes that Mr. Matthews cannot seek to hold Mr. Boyle responsible for those events without alleging that he played some personal role in those events. *See Iqbal,* 129 S.Ct. at 1952.

> FN2. Mr. Matthews' Second Amended Complaint alleges that the referral occurred sometime in early 2007. Construing that allegation in the light most favorable to Mr. Matthews, the Court assumes that it occurred after, rather than before, February 4, 2007.

The Court also concludes that as a matter of law, none of Mr. Boyle's alleged conduct after February 4, 2007 could support Mr. Matthews' § 1983 claim. To prevail on a First Amendment retaliation claim under § 1983, a plaintiff must show: (1) that he spoke on a matter of public concern; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between his speech and the adverse employment action. *See Singh v. New York,* 524 F.3d 361 (2d Cir.2008). As discussed

above, an adverse employment action is any action that might dissuade a reasonable worker from exercising his right to free speech. *See Kaytor,* 609 F.3d at 555. The Court assumes without deciding that Mr. Matthews spoke on matters of public concern. [FN3] However, none of Mr. Boyle's alleged actions after February 4, 2007 constituted an adverse employment action.

> FN3. The Court notes that Mr. Matthews almost certainly did not engage in constitutionally protected speech when he made his initial complaints about officer misconduct and conduct to his superiors in the Department. *See Garcetti v. Ceballos,* 547 U.S. 410, 426, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) ("We reject ... the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties."). However, because Mr. Matthews later made retaliation allegations to the Attorney General's Office and the CHRO, the Court concludes that *Garcetti* does not necessarily control the outcome here.

Mr. Boyle's first alleged action—denying the union's request to have Mr. Matthews placed on paid leave—was not an adverse employment action. Neither the Supreme Court nor the Second Circuit has ever had occasion to consider whether an employer's *denial* of a request for paid leave can constitute an adverse employment action in the First Amendment retaliation context. The argument is somewhat unusual. In this Court's experience, it is more typical for employees to argue that *requiring* an employee to take paid leave constitutes an adverse employment action. *See, e.g., Krukenkamp v. State Univ. of N.Y. at Stony Brook,* No. 09–4933–cv, 2010 WL 3894970, at * 1 (2d Cir. Oct.6, 2010).

**\*8** The Court nevertheless concludes that Mr. Boyle's denial of the union's request did not constitute an adverse employment action for three reasons. First, in an unpublished summary order, the Second Circuit has held that denial of a request for a leave of absence does not constitute an adverse employment action in the equal protection context. *See Williams v. N.Y. City Housing Auth.,* 335 Fed. App'x 108, 110 (2d Cir.2009). Although the phrase "adverse employment action" has a somewhat

Not Reported in F.Supp.2d, 2010 WL 3984645 (D.Conn.)

(Cite as: 2010 WL 3984645 (D.Conn.))

different meaning in that context—specifically, "a materially adverse change in the terms and conditions of ... employment," *Galabya v. N.Y. City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2010)—the Court still finds the Second Circuit's conclusion instructive. Second, at least one other district court within the Second Circuit has rejected the argument that denial of a request for leave can constitute an adverse employment action in the First Amendment retaliation context. *See Casale v. Reo,* 522 F.Supp.2d 420, 427 (N.D.N.Y.2007) ("[N]o reasonable jury could find that refusing to recommend a third consecutive year of leave would dissuade a reasonable employee from engaging in protected speech."). Third, even assuming there are situations in which an employee might, for example, be entitled under a contract to take leave at will—and in which an employer *could* be forced to face a Hobson's choice between granting a request for leave and facing civil liability for retaliation—Mr. Matthews does not allege that he was entitled to take leave at will.

Mr. Boyle's next two alleged actions—approving the union's request to transfer Mr. Matthews out of the Middletown Headquarters, and, after Mr. Matthews' union objected to the Hartford location, approving the union's request for a transfer to the Meriden office—were actually actions taken for Mr. Matthew' *benefit.* Those actions were taken only at the request of Mr. Matthews' union. The Court finds it inconceivable that an employer's decision to grant an employee a benefit at the employee's own request could ever dissuade a reasonable worker from exercising his First Amendment rights. *See Kaytor,* 609 F.3d at 555.

Mr. Matthews' fourth alleged action—referring Mr. Matthews to the Department's Employee Assistance Program for psychological counseling—also did not constitute an adverse employment action. Although no Supreme Court or Second Circuit precedent is directly on point, the Court believes that no reasonable jury could conclude that a supervisor's mere referral of an employee to an internal counseling service would dissuade a reasonable worker from exercising his right to free speech. *See id.; cf. Breaux v. City of Garland,* 205 F.3d 150 (5th Cir.2000) (holding that requiring an employee to undergo a single psychological exam was not an adverse employment action in the First Amendment retaliation

context). The result could conceivably be different if Mr. Boyle had forced Mr. Matthews to undergo psychological treatment, or had publicized his decision to refer Mr. Matthews for psychological counseling to others in the Department. However, Mr. Matthews makes no such allegations in his Second Amended Complaint.

**VI.**

**\*9** In sum, the Court concludes that the Eleventh Amendment bars Mr. Matthews from seeking damages against Mr. Boyle in his official capacity; that Mr. Matthews' claim against Mr. Boyle is time-barred insofar as it seeks damages based on acts that occurred before February 4, 2007; and that none of Mr. Boyle's alleged conduct after February 4, 2007 amounted to an adverse employment action. Because the only federal law claim in Mr. Matthews' Second Amended Complaint fails as a matter of law, the Court declines to exercise supplemental jurisdiction over Mr. Matthews' state law claim against the State of Connecticut and the Connecticut Department of Public Safety. *See Castellano v. Board of Trustees of Police Officers' Variable Supplements Fund,* 937 F.2d 752, 758–59 (2d Cir.1991). Mr. Matthews may pursue that claim in state court if he wishes to do so.

Defendants' Motion to Dismiss [doc. # 33] is therefore GRANTED. **The Clerk of the Court is directed to enter judgment for Mr. Boyle on the § 1983 claim and to close this file.**

IT IS SO ORDERED.

D.Conn.,2010.

Matthews v. Connecticut, Dept. of Public Safety
Not Reported in F.Supp.2d, 2010 WL 3984645 (D.Conn.)
END OF DOCUMENT


Not Reported in F.Supp.2d, 2008 WL 850594 (N.D.N.Y.)

(Cite as: 2008 WL 850594 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Patrick TRACY, Plaintiff,
v.
Patrick J. FRESHWATER; Peter Meskill, Tompkins
County Sheriff, and the Tompkins County Sheriff's
Department, Defendants.
No. 5:01-CV-0500(NPM/GHL).

March 28, 2008.
Patrick Tracy, Terre Haute, IN, pro se.

County of Tompkins, Jonathan Wood, County Attorney,
of Counsel, Ithaca, NY, for Defendants.

MEMORANDUM DECISION AND ORDER

NEAL P. McCURN, Senior District Judge.
    *1 On July 31, 2007, this Court FN1 issued an Order
granting summary judgment in favor of Defendants.
Plaintiff, proceeding *pro se,* now moves for
reconsideration of or relief from that decision under
Federal Rule of Civil Procedure 59(e).

        FN1. By order (Dkt. No. 176) dated March 28,
        2008, this case. previously assigned to Senior
        Judge Howard G. Munson, was reassigned to
        Senior Judge Neal P. McCurn.

    First, the court needs to determine if this motion has
been properly presented under Fed.R.Civ.P.
59(e)-"[m]otion to alter or amend judgment-or
Fed.R.Civ.P. 60(b)"[r]elief from judgment or order". The
Second Circuit Court of Appeals has long held that a
post-judgment motion made within 10 days of entry of
judgment that seeks reconsideration of matters properly
encompassed within a decision on the merits is a motion
under Rule 59(e). *Jones v. UNUM Life Insurance Co. of
America,* 223 F.3d 130, 137 (2d Cir.2000). "[M]otions
filed after the 10-day period, no matter how styled, are to

be treated as Rule 60(b)(1) motions seeking relief from the
judgment. *Feldberg v. Quechee Lakes Corp.,* 463 F.3d
195, 198-99 (2d Cir.2006). The docket sheet in the instant
case shows that Defendants' motion for summary judgment
was granted on July 31, 2007, and Plaintiff's present Rule
59e motion was filed on August 20, 2007. While these
entries clearly indicate that Plaintiff's motion was not
timely filed, nevertheless, the prison mail box rule
provided a timely filing of Plaintiff's motion.

    The prison mailbox rule provides that a *pro se*
inmate's motion is deemed filed on the date it is given to
prison officials. *Houston v. Lack,* 487 U.S. 266, 276, 108
S.Ct. 2379, 101 L.Ed.2d 245 (1988) (establishing the
prison mailbox rule) In cases where it is unclear when the
inmate gave his petition to prison officials, courts have
assumed that the petitioner submitted the petition on the
same date it was purportedly signed and dated. *Porter v.
Greiner,* 2005 WL 3344828, at *7 (E.D.N.Y. Nov. 18,
2005); *Corrigan v. Barbery,* 371 F.Supp.2d 325, 328 n. 4
(W.D.N.Y .2005); *Pack v. Artuz,* 348 F.Supp.2d 63, 66 n.
2 (S.D.N.Y.2004). The rule is premised on the *pro se*
inmate's lack of control-his dependence on the prison mail
system and lack of counsel to assure timely filing with the
court. *Garraway v. Broome County,* 2006 WL 931729, at
*3 (N.D.N.Y. Apr. 7, 2006).

    Plaintiff's proof of service document was sworn to,
signed by Plaintiff on July 13, 2007, placed in a First
Class postage paid correctly addressed envelopes and
placed in the institutional mail box at his correctional
institution. The ten day time limit for filing a Rule 59(e)
motion had not expired on that date because the
intermediate Saturdays and Sundays are excluded when
the time period allowed is less than eleven days. (Rule
6(a) Fed.R.Civ.P. Ergo, Plaintiff's Rule 59(e) motion was
timely filed.

    While some courts hold that a Rule 59(e) motion to
alter or amend the judgment can be brought only after a
trial, "[m]ost courts, however, including those in this
circuit, allow a motion to amend a grant of summary
judgment to be brought under Rule 59(e)." *Patel v.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 850594 (N.D.N.Y.)

(Cite as: 2008 WL 850594 (N.D.N.Y.))

*Lutheran Medical Center, Inc.,* 775 F.Supp. 592, 596 (E.D.N.Y.1991)

**\*2** Rule 59(e) is not an appropriate vehicle for a party dissatisfied with a court's ruling to secure a rehearing on the merits with respect to issues already decided, *USA Certified Merchants, LLC v. Koebel,* 273 F.Supp.2d 501, 503 (S.D.N.Y.2003); *Griffin Industries, Inc. v.. Petrojam, Ltd.,* 72 F.Supp.2d 365, 368 (S.D.N.Y.1999), or to advance " 'new facts, issues or arguments not previously presented to the court.' " *Wechsler v. Hunt Health Systems, Ltd.,* 186 F.Supp.2d 402, 410 (S.D.N.Y.2002). In other words, "[a] party seeking reconsideration 'is not supposed to treat the court's initial decision as the opening of a dialogue in which that party may then use such a motion to advance new theories or adduce new evidence in response to the court's rulings.' " *Polsby v. St. Martin's Press, Inc.,* 2000 WL 98057, at \*1 (S.D.N.Y. Jan. 18, 2000). Thus, Rule 59(e) should be "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the Court," *Williams v. New York City Department of Corrections,* 9 F.R.D. 78, 83 (S.D.N.Y.2003), and "to prevent the rule from being used as a substitute for appealing a final judgment." *USA Certified Merchants,* 273 F.Supp.2d at 503.

"Reconsideration of a court's previous order is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.' " *Montanile v. National Broadcasting Company,* 216 F.Supp.2d 341, 342 (S.D.N.Y.2002) (quoting *In re Health Management Systems Inc. Securities. Litigation.,* 113 F.Supp.2d 613, 614 (S.D.N.Y.2000)).

In his motion for reconsideration, Plaintiff does not assert that this court overlooked or misapplied any controlling legal authority. Rather, he seeks to relitigate the same issues presented to this court before when he objected to the Magistrate Judge's Report and Recommendation. The strict requirements for reconsideration under Rule 59(e) are specifically designed to preclude this type of reargument. *Sutherland v. New York State Department of Law,* 1999 WL 600522, at \*1 (S.D.N.Y. Aug. 10, 1999), "A Rule 59(e) motion is a not

a motion to reargue those issues already considered when a party does not like the way the original motion was resolved."

Accordingly, the Plaintiff's motion for reconsideration is denied.

It is so ORDERED:

N.D.N.Y.,2008.

Tracy v. Freshwater
Not Reported in F.Supp.2d, 2008 WL 850594 (N.D.N.Y.)
END OF DOCUMENT


Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

C Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER FN1

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.FN2 In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

### I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

### II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from these facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### III. Discussion

### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989);* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2013 WL 865844 (S.D.N.Y.)

(Cite as: 2013 WL 865844 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.
Ronald GANTT, Plaintiff,
v.
Martin HORN et al., Defendants.
No. 09 Civ. 7310(PAE).

March 8, 2013.
OPINION & ORDER

PAUL A. ENGELMAYER, District Judge.

**\*1** Plaintiff Ronald Gantt, proceeding *pro se,* brings this action pursuant to 42 U.S.C. § 1983 claiming that defendants—corrections officers employed by the New York City Department of Corrections ("DOC")—violated his Eighth Amendment rights during his incarceration. He claims the defendants (1) acted with deliberate indifference in depriving him of adequate medical treatment, and (2) denied him outdoor recreation.[FN1] Defendants now move for summary judgment under Federal Rule of Civil Procedure 56. For the reasons set forth, that motion is granted.

> FN1. In his opposition to defendants' summary judgment motion, Gantt expressed the intention to abandon an additional claim, based on the confiscation of his footwear. Pl. Br. 4.

**I. Background and Procedural History**[FN2]

> FN2. Although Gantt submitted a short opposition to the motion for summary judgment (Dkt.93), it is essentially devoid of factual assertions, and Gantt failed to file a responsive statement of undisputed facts, as required by Rule 56.1 of the District's Local Civil Rules. Where a party fails to do so, a district court "may in its discretion opt to 'conduct an assiduous review of the record,' " to assure that the non-movant's rights are protected, and the Court

does so here. *Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir.2001)* (quoting *Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 292 (2d Cir.2000)).* The background facts set forth herein are derived from the materials cited in defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, with all ambiguities drawn in favor of the plaintiff. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)* ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). These materials include the Declaration of Jeffrey S. Dantowitz ("Dantowitz Decl.") (Dkt.83) and attached exhibit; the Declaration of Dr. Ross MacDonald ("MacDonald Decl.") (Dkt.84) and attached exhibits; and Defendants' Local Rule 56.1 Statement of Material Fact ("Def.56.1") (Dkt.82). Citations to defendants' 56.1 statement incorporate by reference the documents contained therein.

**A. Overview of Gantt's Incarceration During 2008 and 2009**

Between September 17 and 25, 2008, Gantt was incarcerated by the DOC at the Anna M. Kross Center ("AMKC") on Riker's Island. He was then released on bail. Dantowitz Decl. ¶ 2. Between October 14, 2008, and May 6, 2009, Gantt was again incarcerated and housed at AMKC. *Id.* On May 6, 2009, Gantt was found to be in possession of narcotics and tobacco and was transferred to the Central Punitive Segregation Unit ("CPSU") of the Otis Bantum Correctional Center ("OBCC"). *See* Second Amended Complaint ("SAC") (Dkt.24), at 4; Dantowitz Decl. ¶ 3. On June 16, 2009, Gantt was transferred to a New York State correctional facility. Dantowitz Decl. ¶ 3. On June 26, 2009, Gantt was rearrested and returned to DOC, where he was housed at the Robert N. Davoren Center ("Davoren Center"). On June 28, 2009, Gantt was transferred from the Davoren Center back to the CPSU at OBCC, where he was housed until July 17, 2009. *Id.* Gantt was then again transferred to a New York State

Slip Copy, 2013 WL 865844 (S.D.N.Y.)

(Cite as: 2013 WL 865844 (S.D.N.Y.))

correctional facility. *Id.*

Gantt's claims of Eighth Amendment violations arise from his detention at both at AMKC and OBCC. He claims that the defendants failed to adequately treat his rheumatoid arthritis and glaucoma, and unjustifiably delayed treating those conditions.

**B. Gantt's Medical Treatment**

On September 17, 2008, when Gantt arrived at AMKC, AMKC medical staff performed an intake medical examination. Def. 56.1 ¶ 24. They asked Gantt about any health conditions and whether he was taking medication for ongoing illnesses. *Id.* DOC's records of Gantt's intake do not indicate that he disclosed either that he was suffering from rheumatoid arthritis or glaucoma, or that he reported taking any medication for these, or any other, conditions. *Id.;* MacDonald Decl. Ex. A ("Sept. 17 Exam.").

On October 15, 2008, following his return to DOC custody, a new intake medical screening was performed. MacDonald Decl. ¶ 24. DOC's records of Gantt's intake reflect that Gantt told attending medical staff that he suffered from rheumatoid arthritis. DOC's records do not, however, reflect that Gantt identified any medications he was currently taking, or that Gantt disclosed that he was suffering from glaucoma. *Id.; id.* Ex B ("Oct. 15 Exam."). The attending medical staff developed a plan to treat the pain associated with Gantt's rheumatoid arthritis, which included his taking 500 milligrams of Naprosyn twice daily. Oct. 15 Exam. at 4. That plan was approved by a supervising physician. *Id.* The same day, a pharmacy order was issued authorizing the administration to Gantt of 500 milligrams of Naprosyn twice daily for four days. MacDonald Decl. ¶¶ 25–26; *id.* Ex. C.<sup>FN3</sup>

> **FN3.** It is unclear whether Gantt received this Naprosyn as prescribed. Gantt claims in his Second Amended Complaint that he did not receive it for two weeks and that, in response, he placed his name on a sick call list requesting medical attention. SAC 3. An inmate who makes such a request can request a visit to the AMKC clinic for evaluation Monday through Friday, MacDonald Decl. ¶ 6, and may also seek medical treatment by making an emergency sick call, at any time. *Id.* Gantt's medical records, which

include records of other sick-call consultations, do not reflect any sick-call requests or consultations before December 14, 2008. *Id.* ¶ 27. On the other hand, the medical records do not reflect the distribution of a four-day order of Naprosyn to Gantt in accordance with the October 15 pharmacy order. MacDonald Decl. Ex. C. Even assuming that Gantt did not receive the Naprosyn prescribed in October, however, for the reasons that follow, this lapse is insufficient to support a claim under the Eighth Amendment.

**\*2** On December 14, 2008, during an emergency sick call, Gantt reported to the attending physician that he had glaucoma and required medication. MacDonald Decl. ¶ 27. The physician referred Gantt to the optometry clinic and issued a consultation request that Gantt be evaluated by the appropriate specialist. *Id.; id.* Ex. D ("Dec. 14 Consultation Request"). The same day, the site medical director approved that request; Gantt was given an appointment at the prison's optometry specialty clinic scheduled for December 19, 2008. MacDonald Decl. ¶¶ 27–28. According to the DOC's records of Gantt's medical history, Gantt refused this appointment. *See* Dec. 14 Consultation Request.<sup>FN4</sup>

> **FN4.** In his Second Amended Complaint, Gantt alleges that he "never refused any medical direction." SAC 3. Under Correctional Health Service ("CHS") policy, an inmate who refuses an appointment with a specialist must complete a Refusal of Treatment form indicating that he has met with medical staff and understands the risks of refusing such treatment. MacDonald Decl. ¶ 13. Defendants have not produced such a form related to Gantt's optometry appointment. Gantt's refusal is instead documented only in a handwritten notation on the Consultation Request. *See* Dec. 14 Consultation Request.

On January 26, 2009, during a sick call visit, an attending physician examined Gantt, who had complained of pain associated with rheumatoid arthritis. MacDonald Decl. ¶ 29; SAC 3. The attending physician prescribed 500 milligrams of Naprosyn twice a day for five days.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 865844 (S.D.N.Y.)

(Cite as: 2013 WL 865844 (S.D.N.Y.))

MacDonald Decl. ¶ 29; *id.* Ex. E. That evening, Gantt received a four-day supply of Naprosyn. MacDonald Decl. Ex. F; *id.* ¶ 30.

The attending physician also referred Gantt to a rheumatologist. *Id.* ¶ 31; *id.* Ex. G. On February 11, 2009, Gantt was examined by a rheumatology specialist at Bellevue Hospital. MacDonald Decl. ¶ 31; SAC 4. The specialist recommended that Gantt receive 500 milligrams of Naprosyn twice a day or 600 milligrams of Ibuprofen three times a day. MacDonald Decl. ¶ 31.

On February 24, 2009, Gantt was seen for mental health care by an AMKC social worker, who referred Gantt to the medical clinic for an evaluation related to his arthritis and glaucoma. *Id.* ¶ 32. Two days later, on February 26, 2009, attending medical staff prescribed Gantt 500 milligrams of Naprosyn twice a day for three days. *Id.* ¶ 33. That evening, Gantt received a three-day supply of Naproxen (another name for Naprosyn). *Id.; id.* Ex. H.

On May 7, 2009, in response to complaints of wrist pain, Gantt was prescribed 500 milligrams of Naproxen twice a day for four days. *Id.* ¶ 34. The following evening, Gantt received a four-day supply of Naproxen. *Id.* Ex. I.

On June 27, 2009, Gantt was prescribed 400 milligrams of Motrin three times a day for four days; the following evening he received the Motrin. *Id.* ¶ 35; *id.* Ex. J. During the June 27, 2009 evaluation, Gantt reported for the first time that he had not taken glaucoma medication during the preceding eight months. *Id.* ¶ 36. He told the attending medical staff that he had missed his December 2008 ophthalmology appointment and, for the first time, told medical staff that he had previously been prescribed Travatan and Timolol. *See id.* Ex. K ("June 27 Consultation Request"). Gantt was referred to the optometry clinic for evaluation. *Id.* However, Gantt failed to appear for his July 6, 2009 appointment at that clinic. *See id.* Ex. L ("Specialty Clinic Form") (indicating that Gantt was a "No show" and needed a new appointment).

**\*3** On July 12, 2009, Gantt was prescribed 400 milligrams of Motrin to be taken once a day for five days, and received a seven-day supply of Motrin the following

evening. *Id.* Ex. M. On July 14, 2009, Gantt was examined by an attending physician who again referred him to the optometry specialty clinic for evaluation of his glaucoma. *Id.* Ex. N ("July 14 Consultation Request"). On July 17, 2009, however, before he could be seen by the optometry clinic, Gantt was discharged from DOC and transferred to a New York State correctional facility. *Id.* ¶ 39; Dantowitz Decl. ¶ 3.

Although Gantt alleges that his eyesight "will suffer in the long run because of the action of the defendants," he acknowledges that his eyesight is "not yet damaged." SAC 7. When deposed on April 13, 2012, Gantt attested that he is "in regular shape except for the pain in the neck [and] back area." Dantowitz Decl. Ex. A ("Gantt Dep.").

## C. Gantt's Administrative Grievances

DOC's grievance procedure, the Inmate Grievance Resolution Program (the "IGRP"), sets out the steps an inmate must follow to exhaust his or her administrative remedies. Dantowitz Decl. ¶ 4. It states that "[i]f the inmate has not received any response [within the five-day period for informal resolution of grievances], the inmate should go to the Grievance Office to sign Form # 710R and indicate on that form that a hearing is requested." *Id.* ¶ 5 (citation omitted). The IGRP also specifies the process that inmates confined to their cells must use to make a hearing request. *Id.* It further provides that inmates must appeal adverse determinations of their grievances to the warden, then to the Central Office Review Committee, and finally to the Board of Correction. *Id.* ¶ 6. *See, e.g., Mamon v. N.Y.C. Dep't of Corr.,* No. 10 Civ. 8055(NRB), 2012 WL 260287, at \* 3 (S.D.N.Y. Jan. 27, 2012) (summarizing the IGRP).

Gantt alleges that beginning in October 2008, he filed four formal grievances relating to his medical care while in prison. *See* SAC 3, 4, 6. In support of his allegations, Gantt attached three of these grievances filed in May 2009, two on May 26, 2009. SAC 12–19. These grievances allege, *inter alia,* (1) denial of medical services, (2) denial of recreation time, and (3) deficient cleanliness of visitation areas.[FN5] Gantt further alleges that his grievances went unanswered by prison officials. *Id.* DOC records indicate that, although Gantt's grievances were apparently not acted upon, Gantt neither requested a hearing in connection with any of his formal grievances,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 865844 (S.D.N.Y.)

(Cite as: 2013 WL 865844 (S.D.N.Y.))

nor filed an appeal with the warden of any DOC facility, the Central Office Review Committee, or the Board of Correction. Dantowitz Decl. ¶ 7. Gantt acknowledges that he did not request a hearing related to his grievances and that he did not file any appeal. Pl. Br. 1–2.

> FN5. Gantt does not bring any claim here relating to the cleanliness of visitation areas.

**D. Procedural History**

On August 19, 2009, Gantt filed his original Complaint against the DOC and individual corrections officers pursuant to 42 U.S.C. § 1983, alleging violations of his Eighth Amendment rights. Dkt. 2. On March 24, 2010, defendants filed their answer to Gantt's original Complaint. Dkt. 13. On September 23, 2010, Gantt filed his First Amended Complaint. Dkt. 21. On January 24, 2011, with permission of the Court, Gantt filed his Second Amended Complaint. Dkt. 24. On May 3, 2011, defendants filed their answer to Gantt's Second Amended Complaint. Dkt. 48. On May 10, 2011, the Court set a discovery schedule. Dkt. 52. On August 21, 2012, after several extensions of the discovery period and briefing schedule, defendants moved for summary judgment. Dkt. 81–85. On December 28, 2012, Gantt submitted his opposition to the motion for summary judgment. Dkt. 93. On January 10, 2013, defendants filed a reply. Dkt. 94.

**II. Applicable Legal Standard**

**\*4** Under Rule 56, to prevail on a motion for summary judgment, the movant must "show [ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In determining whether this standard has been met, the Court must view all facts "in the light most favorable" to the non-moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir.2008). To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed.R.Civ.P. 56(c)(1); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir.2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Hicks

v. Baines, 593 F.3d 159, 166 (2d Cir.2010) (citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Johnson v. Killian, 680 F.3d 234, 236 (2d Cir.2012) (citing Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir.2003)).

The Court is mindful that Gantt is a *pro se* litigant whose submissions must be construed to "raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F .3d 471, 474 (2d Cir.2006) (per curiam) (citation and emphasis omitted). However, this forgiving standard "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir.2003) (citation omitted). Bald assertions by a *pro se* litigant, " 'completely unsupported by evidence, [are] not sufficient to overcome a motion for summary judgment.' " Geldzahler v. N.Y. Med. Coll., 746 F.Supp.2d 618, 620 n. 1 (S .D.N.Y.2010) (quoting Lee v. Coughlin, 902 F.Supp. 424, 429 (S.D.N.Y.1995)).

Under Local Civil Rule 56.1, which governs factual statements on motions for summary judgment, "[e]ach numbered paragraph in the statement of material facts ... will be deemed to be admitted ... unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civ. R. 56.1(c). In addition, "[e]ach statement by the movant or opponent ... including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed.R.Civ.P. 56(c)." Local Civ. R. 56.1(d). When moving for summary judgment against a *pro se* litigant, the movant must provide the *pro se* litigant with "the papers in support of the motion ... [and the] 'Notice To Pro Se Litigant Who Opposes a Motion For Summary Judgment' with the full texts of Fed.R.Civ.P. 56 and Local Civil Rule 56.1 attached." Local Civ. R. 56.2. *Pro se* litigants provided with notice are not excused from satisfying their obligations under Local Civil Rule 56.1. Allen v. City of

Slip Copy, 2013 WL 865844 (S.D.N.Y.)

(Cite as: 2013 WL 865844 (S.D.N.Y.))

N.Y., 480 F.Supp.2d 689, 703 (S.D.N.Y.2007) (citing Vt. Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 244 (2d Cir.2004)).

**\*5** Here, Gantt received such notice: Defendants furnished him with their papers, the required notice, and copies of Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1. *See* Dkt. 81. Gantt, however, failed to submit a responsive statement of material facts. Although defendants argue that Gantt's failure necessitates admission of all factual statements provided in defendants' 56.1 Statement, *see* Def. Reply. Br. 2–4, that is not so: The Court may not rely solely on the statement of undisputed facts contained in the movant's Local Rule 56.1 statement. Rather, the Court "must be satisfied that the citation to evidence in the record supports the [movant's] assertion," *i.e.,* that the materials underlying defendant's 56.1 statement themselves establish these facts. *Vt. Teddy Bear Co.,* 373 F.3d at 244 (citing Giannullo v. City of N.Y., 322 F.3d 139, 143 n. 5 (2d Cir.2003)).

### III. Discussion

Defendants argue that: (1) Gantt failed to exhaust his administrative remedies, which, under 42 U.S.C. § 1997e(a), bars his claims here; (2) the facts do not permit the inference that the defendants acted with deliberate indifference to his medical needs; (3) DOC is not a suable entity and there is no basis for finding municipal liability; and (4) Gantt failed to serve certain named defendants, thus depriving this Court of jurisdiction over those individuals.

Defendants are correct that DOC is not a suable entity. *See, e .g.,* N.Y.C. Charter Ch. 17 § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law."); Jenkins v. N.Y.C. Dep't of Homeless Servs., 643 F.Supp.2d 507, 510 (S.D.N.Y.2009) ("The Defendant is 'clearly correct' and 'the overwhelming body of authority holds that [a city agency] is not a suable entity.' " (quoting Renelique v. Doe, No. 99 Civ. 10425(LTS) (HBP), 2003 WL 23023771, at *6 (S.D.N.Y. Dec. 29, 2003))). Accordingly, for the purposes of resolving this motion, the Court will

substitute the City of New York for DOC. *See, e.g.,* Renelique, 2003 WL 23023771, at *7 (treating City, not agency, as defendant for purposes of resolving summary judgment motion).

For the reasons that follow, the Court holds that Gantt has failed (1) to exhaust his administrative remedies, and (2) to establish that defendants acted with deliberate indifference to serious medical needs. The Court accordingly grants summary judgment to defendants, and has no need to reach defendants' arguments as to defective service or municipal liability.

### A. Exhaustion

The Prison Litigation Reform Act ("PLRA") requires an inmate to exhaust all available administrative remedies before bringing a federal civil rights action. 42 U.S.C. § 1997e(a). Under the PLRA, " '[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.' " Dennis v. Westchester Cnty. Jail Corr. Dep't, 485 F. App'x 478, 480 (2d Cir.2012) (summary order) (quoting 42 U.S.C. § 1997e(a)). "This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim." Simmons v. Bezio, No. 9:11–CV–753 (DNH/ATB), 2012 WL 3054127, at *2 (N.D.N.Y. June 21, 2012) (citing Giano v. Goord, 380 F.3d 670, 675–676 (2d Cir.2004)) (additional citations omitted). Inmates must exhaust their administrative remedies even if they are seeking only money damages otherwise unavailable in prison administrative proceedings. Giano, 380 F.3d at 675.

**\*6** Failure to exhaust all available administrative remedies is an affirmative defense. Jones v. Bock, 549 U.S. 199, 216 (2007); Johnson v. Testman, 380 F.3d 691, 695 (2d Cir.2004), overruled on other grounds by Woodford v. Ago, 548 U.S. 81 (2006). It must be raised by a defendant, and it is the defendant's burden to prove that the plaintiff failed to meet the exhaustion requirements. *See* Key v. Toussaint, 660 F.Supp.2d 518, 523 (S . D.N.Y.2009). The prison's requirements, and not the PLRA, "define the boundaries of proper exhaustion."

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Espinal v. Goord,* 558 F.3d 119, 124 (2d Cir.2009) (quoting *Jones,* 549 U.S. at 218).

"Courts must construe the exhaustion requirement strictly because '[a] prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction' and '[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance.' " *Petrucelli v. Hasty,* 605 F.Supp.2d 410, 419 (E.D.N.Y.2009) (quoting *Woodford,* 548 U.S. at 95). Thus, partial exhaustion of administrative remedies is not sufficient, even if prison officials have actual notice of a claim. *See Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007).

The Second Circuit has identified limited circumstances under which administrative exhaustion is not mandatory. Exhaustion is not mandatory when:

(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion remedy.

*Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 175 (2d Cir.2006). Here, Gantt does not deny knowledge of the appeals procedure. Rather, he claims, in his opposition to summary judgment, that he did not follow the grievance appeals process because "his efforts were thwarted by defendant Gerrant." Pl. Br. 1. In his Second Amended Complaint, Gantt does not make such a claim. It does allege that he filed at least 15 grievances against medical staff and corrections officials, but that at least 11 were confiscated and he was able to produce only three. SAC 6. As to the response to those grievances, Gantt's Second Amended Complaint alleges only that Guerrant did not respond to his grievances, *id.,* not that he took affirmative steps to block Gantt from appealing.

Under the IGRP, Gantt was required to file an appeal if he did not receive a response to his grievance after five days—that is, "[t]he IGRP places the burden on the

prisoner to request a formal hearing when there is no timely response to a grievance." *Malik v. City of N.Y.,* No. 11 Civ. 6062(PAC)(FM), 2012 WL 3345317, at *7 (S.D.N.Y. Aug. 15, 2012), *report and recommendation adopted,* 2012 WL 4475156 (S.D.N.Y. Sep. 28, 2012). Gantt does not allege that he was misinformed or denied information about these procedures. Thus, his failure to exhaust cannot be excused unless he can allege facts sufficient to demonstrate an "affirmative act by prison officials that would have prevented him from pursuing administrative remedies." *Ruggiero,* 467 F.3d at 178.

**\*7** Here, Gantt—including in the opposition to summary judgment, in which he stated generally that his efforts to appeal had been thwarted—has failed to allege any "affirmative act" by prison officials that prevented him from either requesting a hearing or filing an appeal in accordance with the IGRP. Gantt offers only the conclusory statement that he was "thwarted" from doing so. This case is thus a far cry from those that have found prison official defendants estopped from raising non-exhaustion as an affirmative defense. In each, the prisoner alleged concrete affirmative steps that officials had taken to prevent him from availing himself of administrative remedies. *See, e.g., Ziemba v. Wezner,* 366 F.3d 161, 162–63 (2d Cir.2004) (recognizing estoppel as defense to PLRA exhaustion requirement where plaintiff alleged that he was beaten and threatened by prison officials and denied food and medical care in retaliation for his grievances); *Hemphill v. New York,* 380 F.3d 680, 687 (2d Cir.2004) (plaintiff threatened with retaliation for pursuing administrative remedies). Gantt alleges no such thing. The most that his Second Amended Complaint can be said to allege by way of retaliation is that defendants told him that he would not get recreation. SAC 7. However, as Gantt acknowledges, even that statement was not in response to his grievances, but in response to his "yelling out of [his] cell." *Id.* And even if such a threat could be found and, contrary to Gantt's allegations, even if it had been made in response to his grievances, a threat to deny recreation would not suffice to prevent Gantt from pursuing administrative remedies.[FN6]

FN6. For this and other reasons, summary judgment is merited for the defense on the merits of Gantt's claim based on an alleged denial of

recreation. Although Gantt's Second Amended Complaint and grievances allege generally that he was denied recreation, he has not mustered any factual support for this claim. Nor has he clearly alleged, let alone supported, specifically what recreation was denied to him. Gantt's allegations leave unclear whether Gantt alleges he was denied all recreation during his incarceration; Gantt states only that "[e]ach morning, for the duration of [his] stay at OBCC, [he] was never given recreation." SAC 5. In any event, even assuming that Gantt was denied not just morning recreation but recreation at all hours during his incarceration at OBCC, that denial would not give rise to an Eighth Amendment claim. "Denial of a prisoner's recreation privileges for an extended period of time violates the Eighth Amendment if the denial results in a deprivation 'of the minimal civilized measure of life's necessities' and the defendants act with a sufficiently culpable state of mind amounting to deliberate indifference to a serious need." *Beckford v. Portundo,* 151 F.Supp.2d 204, 213 (N.D.N.Y 2001) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981)); *see also Anderson v. Coughlin,* 757 F.2d 33, 36 (2d Cir.1985). Gantt does not allege that he was denied all opportunity to exercise, but only that he was denied outdoor recreation. *See Anderson,* 757 F.2d at 36 (noting "[c]ourts have recognized that some opportunity for exercise must be afforded to prisoners," but the Constitution does not mandate it take a particular form). The Court further notes that Gantt was incarcerated at OBCC for a total of 64 non-consecutive days in 2009. That period is shorter than those in which a wholesale denial of recreation has been held to rise to the level of an Eighth Amendment violation. *See, e.g., Jolly v. Coughlin,* 76 F.3d 468, 480–81 (2d Cir.1996) (three-and-a-half year denial of recreation held to violate the Eighth Amendment).

Therefore, defendants are not estopped from raising this defense, and Gantt's failure to exhaust his administrative remedies is not excused. *See Ruggiero,* 467 F.3d at 178. Because Gantt failed to exhaust his

administrative remedies or to supply an excuse for his failure to do so, defendants' motion for summary judgment must be granted as to all his claims.

**B. Medical Care Claims**

An independent basis for granting summary judgment is that Gantt has failed to adduce evidence sufficient to support an Eighth Amendment claim based on the medical care during his incarceration. To state a claim under § 1983, Gantt must show that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Sinder v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999).

Here, Gantt claims that, during his incarceration, the defendants, by acting with deliberate indifference to his medical needs, violated his Eighth Amendment rights. The Eighth Amendment protects prisoners from "cruel and unusual punishment" caused by prison officials. U.S. Const. amend. VIII. "To determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to 'the evolving standards of decency that mark the progress of a maturing society.' " *Graham v. Florida,* 130 S.Ct. 2011, 2021 (2010) (quoting *Estelle v. Gamble,* 429 U.S. 97, 102, (1976)).

**\*8** Where an Eighth Amendment claim involves alleged denials of medical care, "a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle,* 429 U.S. at 104) (alteration in original). This standard incorporates both objective and subjective elements: "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2002); *see also Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

With respect to the objective element, there is no "static test" to determine whether a deprivation is sufficiently serious. *Jabbar,* 683 F.3d at 57. A serious medical need is generally characterized by "a condition of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 865844 (S.D.N.Y.)

(Cite as: 2013 WL 865844 (S.D.N.Y.))

urgency, one that may produce death, degeneration, or extreme pain." *Johnson v. Wright,* 412 F .3d 398, 403 (2d Cir.2005) (citation omitted). The Second Circuit has endorsed considering various factors in determining the existence of a serious medical condition, including: (1) the "existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment"; (2) "the presence of a medical condition that significantly affects an individual's daily activities"; (3) "the existence of chronic and substantial pain"; and (4) "adverse medical effects or demonstrable physical injury." *See Chance,* 143 F.3d at 702; *Smith,* 316 F.3d at 187.

Where a claim concerns the temporary delay or interruption in the provision of medical treatment—as is the case here—then "the focus shifts to the particular risk of harm faced by a prisoner due to the challenged *deprivation of care,* rather than the prisoner's underlying medical condition in the abstract." *Edmonds v. Cent. N.Y. Psych. Ctr.,* No. 10 Civ. 5810(DAB), 2011 WL 3809913, at *4 (S.D.N.Y. Aug. 25, 2011) (emphasis added); *see also Chance,* 143 F.3d at 702; *Smith,* 316 F.3d at 186–87; *accord Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1188–89 (11th Cir.1994) ("[D]elay in medical treatment must be interpreted in the context of ... whether the delay worsened the medical condition."). A short interruption of care, even if the underlying medical condition is serious, does not constitute a serious medical need where "the alleged lapses in treatment are minor and inconsequential." *Smith,* 316 F.3d at 186. On the other hand, "the failure to provide treatment for an otherwise insignificant wound may violate the Eighth Amendment if the wound develops signs of infection, creating a substantial risk of injury in the absence of appropriate medical treatment." *Id.; see also Chance,* 143 F.3d at 702.

Here, Gantt alleges that the defendants acted with deliberate indifference by refusing to provide him with "proper" treatment of his rheumatoid arthritis and glaucoma. On the summary judgment record, Gantt received treatment for his arthritis and was given the opportunity to seek consultation as to his glaucoma as soon as he notified prison officials. Accordingly, his claim is properly characterized as challenging the adequacy and timeliness of treatment, not as asserting a failure to provide any treatment.

**\*9** Measured against cases involving temporary delays or interruptions in the provision of treatment, these facts, taken in the light most favorable to Gantt, fall far short of satisfying the objective component of an Eighth Amendment claim. In cases where temporary delays or interruptions in the provision of medical treatment have been held to satisfy the objective seriousness requirement, they have involved either a needlessly prolonged period of delay or a delay that caused extreme pain or exacerbated a serious illness. *See, e.g., Salahuddin v. Goord,* 467 F.3d 263, 281 (2d Cir.2006) (assuming, *arguendo,* that a five-month delay in treatment for Hepatitis C caused sufficiently serious harm); *Chance,* 143 F.3d at 702 (finding a six-month delay in treatment for a dental condition that led to infection and extreme pain sufficiently serious); *Hathaway,* 37 F.3d at 65, 67 (finding a two-year delay in treatment of broken pin in an inmate's hip that caused persistent pain sufficiently serious).

Gantt's claim is based on the delay in his receipt of medication to treat his arthritis and glaucoma. However, the summary judgment record reflects that he first informed defendants of his rheumatoid arthritis on October 15, 2008, a full month after his initial arrival at AMKC. *Compare* Sept. 17 Exam., *with* Oct. 15 Exam. It further reflects that Gantt, on October 15, 2008, and five more times during the ensuing months, was given six prescriptions for medications intended to treat pain associated with his rheumatoid arthritis. *See* MacDonald Decl. Ex. C (Oct. 15, 2008); *id.* Ex. E (Jan. 26, 2009); *id.* Ex. H (Feb. 26, 2009); *id.* Ex. I (May 7, 2009); *id.* Ex.J (June 27, 2009); *id.* Ex. M (July 12, 2009). In addition, Gantt was seen by a rheumatology specialist at Bellevue Hospital. *See* MacDonald Decl. ¶ 31.

As to Gantt's glaucoma, on the record before the Court, he did not disclose that condition to defendants until December 14, 2008, at which time the attending physician referred Gantt to the optometry clinic. There is a dispute whether Gantt, as defendants claim, refused to attend his scheduled appointment at the optometry clinic, or whether, as Gantt claims, he never refused treatment. Either way, however, there is no factual basis for a claim that Gantt at that time was denied treatment. Gantt was subsequently evaluated on June 27, 2009, at which time he

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 865844 (S.D.N.Y.)

(Cite as: 2013 WL 865844 (S.D.N.Y.))

disclosed that he had previously been prescribed Travatan and Timolol for his glaucoma. *See* June 27 Consultation Request. Gantt was again referred to the optometry clinic and, on the undisputed medical record, he failed to appear for his scheduled appointment.*See* Specialty Clinic Form. Finally, on July 14, 2009, Gantt was again referred to the optometry clinic, but he was discharged from DOC custody before he could attend his scheduled appointment. *See* July 14 Consultation Request; Dantowitz Decl. ¶ 3.

Even reading these facts in the light most favorable to Gantt, including treating the unsworn allegations in his Complaint as creditable allegations, Gantt has failed to demonstrate how the modest delays suggested above in the provision of medical treatment, or for that matter the actual medical treatment provided by the defendants, placed him at risk of serious harm. Gantt claims generally that he suffered pain caused by his arthritis, but Gantt does not allege that his pain or discomfort from either his arthritis or glaucoma was prolonged. Quite the contrary, in his deposition, Gantt stated that he was "in regular shape" and, in the Second Amended Complaint, acknowledged that his eyesight is as-yet undamaged by his glaucoma. Gantt Dep. 47; SAC 7. Thus, Gantt has not alleged that any delays in his treatment caused any symptoms of his underlying illnesses to worsen, or that any delays materially altered the way his diseases have since affected him. Furthermore, Gantt has not alleged, beyond making conclusory claims, that any delay in treatment, or any inadequacy of such treatment, has put him at an "unreasonable risk of future harm." *Smith,* 316 F.3d at 188. The facts at hand fall far short of those in cases in which courts have found an objectively serious injury.

*10 Because Gantt has failed to satisfy the objective prong of the Eighth Amendment inquiry, the Court need not address the subjective prong. However, the Court does so here in the interest of completeness. Gantt's claim fails to meet the subjective standards because the facts failed to permit a factfinder to find that "the charged official[s acted] with a sufficiently culpable state of mind ." *Hathaway,* 99 F.3d at 553.

The deliberate indifference standard requires "more than mere negligence." *Farmer v. Brennan,* 511 U.S. 825, 835 (1994). It is "equivalent to criminal recklessness,

[where] the official 'knows of and disregards an excessive risk to inmate health or safety.' " *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (quoting *Farmer,* 511 U.S. at 837). "[A] prisoner must demonstrate more than 'an inadvertent failure to provide adequate medical care' by prison officials to successfully establish Eighth Amendment liability." *Smith,* 316 F.3d at 184 (quoting *Estelle,* 429 U.S. at 105).

Here, Gantt does not allege, and if he had, the record would not support, that defendants acted with deliberate indifference to his medical needs. On the contrary, Gantt's medical records demonstrate that the defendants were, at a minimum, fairly attendant to Gantt's medical issues. They show that when Gantt requested treatment, prison medical staff responded. When Gantt informed medical staff of his rheumatoid arthritis and each subsequent time he complained of pain to medical staff, a prescription was issued for Naprosyn or another analgesic, and he was ultimately issued seven prescriptions for analgesics to address pain caused by his rheumatoid arthritis and seen by a rheumatoid specialist at Bellevue Hospital. When Gantt finally disclosed his glaucoma, he was referred to the optometry specialty clinic for evaluation. The facts, without more, are inconsistent with the thesis that defendants acted with deliberate indifference to his medical needs.

As the Second Circuit has emphasized, the Eighth Amendment "is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law." *Smith,* 316 F.3d at 184. "[N]ot every lapse in prison medical care will rise to the level of a constitutional violation." *Id.* Further, "mere disagreement over the proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 703. The facts before the Court permit a factfinder to find neither that Gantt suffered a sufficiently serious deprivation of medical care, nor that any lapse or delay was caused by a prison official's deliberate indifference. Accordingly, summary judgment must be granted for defendants on Gantt's Eighth Amendment medical care claims.

### CONCLUSION

For the foregoing reasons, Defendants motion for summary judgment is granted and the plaintiff's Second

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 865844 (S.D.N.Y.)

(Cite as: 2013 WL 865844 (S.D.N.Y.))

Amended Complaint is dismissed in its entirety, with prejudice, as to all defendants. The Clerk of Court is directed to terminate the motion pending at docket number 81 and to close the case.

**\*11** The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438,444–45 (1962).

SO ORDERED.

S.D.N.Y.,2013.

Gantt v. Horn
Slip Copy, 2013 WL 865844 (S.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.